In the Matter of T & B GENERAL CONTRACTING, INC., Debtor.

T & B GENERAL CONTRACTING, INC., Plaintiff,

v.

BALLENGER CORPORATION, Defendant.

No. 79–376 T.

United States Bankruptcy Court,
M. D. Florida,
Tampa Division.

June 10, 1981.

Thomas B. Mimms, Tampa, Fla., for T & B General Contracting, Inc.

William Earle Tucker, Tampa, Fla., for Ballenger Corporation.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a pre-Code arrangement proceeding and the matter under consideration

is an objection by the Debtor, T & B General Contracting, Inc. (T & B) to claim No. 82 filed by Ballenger Corporation (Ballenger) and a counterclaim filed by T & B. T & B seeks to recover monies allegedly owing to T & B from Ballenger for equipment rental and for progress payments for work performed by T & B on four interstate highway projects.

The original proof of claim filed by Ballenger, dated June 12, 1979, set forth a claim in the amount of $2,667,297.06 and stated that:

"This claim is not subject to any set-off or counter-claim except that it is subject to being reduced by way of various credits due to Debtor by way of retainage or increased by way of continuing damages incurred through the continuation of Department of Transportation projects on which Debtor is in default."

Attached to this proof of claim are exhibits submitted as supporting documents of the claim relating to the four interstate projects; showing the amounts allegedly paid out by Ballenger through May 15, 1979; the unpaid balance due to T & B on each job; the estimated cost to complete the projects over and above unit prices yet to be received from the State of Florida Department of Transportation (DOT) and statements of an overpayment of quantity by the DOT. (T & B's Exh. # 24).

This proof of claim was challenged by T & B initially on the ground that T & B is not indebted to Ballenger in any amount; and in the alternative that it was contingent and unliquidated, therefore, it cannot be allowed by virtue of § 57(d) of the Bankruptcy Act unless the claim is either estimated or liquidated and the contingency is removed.

Initially this Court agreed and disallowed the claim, but granted Ballenger leave to file an amended proof of claim. Ballenger did file an amended claim which is now the subject matter of this litigation.

The underlying facts pertinent to this controversy as they appear from the record established at the final evidentiary hearing are as follows:

T & B is a Florida corporation and has maintained its principal place of business in Punta Gorda, Florida since November 1, 1975. T & B was primarily engaged in road construction and construction of underground utilities. Ballenger is a South Carolina corporation having its principal headquarters in Greenville, South Carolina. The principal business of Ballenger is interstate highway construction and bridge construction.

In March of 1977, Ballenger and T & B entered into four contracts all relating to an interstate highway construction for DOT. Ballenger was the prime contractor on these projects and T & B was a subcontractor. The contracts in dispute are the following:

Project No. 12–75–3406, representing the subcontract dated April 1, 1977, hereinafter referred to as "Lee County Job." (T & B's Exh. # 1).

Project No. 01075–3403, representing the subcontract dated November 3, 1977, hereinafter referred to as "Charlotte County Job." (T & B's Exh. # 2).

Project No. 17075–3407, representing the subcontract dated October 25, 1977, hereinafter referred to as "Sarasota South Job." (T & B's Exh. # 4).

Project Nos. 17008–3501 and 17075–3408, representing the subcontract dated May 10, 1978, hereinafter referred to as "Sarasota North Job." (T & B's Exh. # 3).

In the latter part of the summer of 1978, T & B began to experience cash flow problems. In an attempt to solve its problem, T & B entered into an accounts receivable financing arrangement with the Port Charlotte Bank & Trust Company (Bank). The advances by the Bank were to be based on and secured by the monthly pay estimate draws due to T & B on the various interstate construction projects mentioned earlier. Ballenger agreed that all drafts would be made payable jointly to the Bank and T & B and would be delivered directly to the Bank. According to the understanding of the parties, upon Ballenger's confirmation

of the estimates, the Bank would advance funds to T & B based upon the estimated draw due to T & B. This monthly financing arrangement was confirmed by a series of letters from Ballenger to the Bank confirming the pay estimates due to T & B. (T & B's Exh. # 23).

On March 8, 1979, the principals of T & B and their counsel met with the principals of Ballenger and their counsel in Punta Gorda, Florida. During the course of that meeting, representatives of Ballenger stated that Ballenger would not pay the January pay estimate to T & B and notified the Bank that the January pay estimate would not be paid jointly to the Bank and T & B. On the same date the payroll account of T & B in the approximate amount of $22,000 was garnished by W. W. Williams Company, a judgment creditor of T & B. As the result, T & B was unable to meet its payroll. In addition, T & B's workman's compensation and liability insurance was cancelled. Upon learning the foregoing, Ballenger decided to terminate its contracts with T & B on the four interstate projects. The notice of termination to T & B from Ballenger stated as a ground for termination lack of insurance and the inability of T & B to pay the wages of its employees.

The notice of termination stated that "all personnel and equipment being utilized on these projects are hereby directed to remain available on the projects for utilization by Ballenger until further notice. Ballenger will make payrolls and reasonable rentals on equipment so utilized, and insurance requirements will be met by Ballenger." (T & B's Exh. # 5). In accordance with the directive of Ballenger, T & B complied and made available to Ballenger all of its equipment which were on the respective job sites.

On March 22, 1979, shortly after the notice of termination, T & B filed its petition pursuant to Chapter XI of the Bankruptcy Act. Although T & B was authorized by the March 23, 1979 order of this court to continue to remain in possession and operate its business, it is without serious dispute that T & B is, for all practical purposes, a defunct entity; it no longer has any employees; and it is not engaged in business in the conventional sense.

This is the basic factual background of this controversy as represented by this vague and confusing record which is to furnish the basis on which the ultimate resolution of this controversy must ultimately rest.

It is Ballenger's primary contention that it should be permitted to set-off against the counterclaim of T & B, the costs incurred by it to complete the four interstate jobs, including 8% overhead and a charge for equipment rental. T & B disputes this contention on the following grounds:

(1) that Ballenger has failed to establish its right to a set-off by a preponderance of the evidence;

(2) that there is an absence of mutuality of debts to permit set-off as to the equipment rental since rental occurred after the commencement of the Chapter XI proceeding while T & B was a debtor-in-possession;

(3) that set-off is only permissive and that under the circumstances set-off would be inequitable and unjust; and

(4) that in the event the Court concludes that Ballenger has established a right to set-off, the set-off should be subordinated to the claim of other creditors based upon the equities of this case.

The Bankruptcy Act of 1898 contains a specific provision which deals with the matter of set-off and provides as follows:

"§ 68.   *Set-Offs and Counterclaims.*

(a) In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set-off against the other, and the balance only shall be allowed or paid.

(b) A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate and allowable under subdivision g of § 57 of this Act; or (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing with a view to such use and with knowledge or

notice that such bankrupt was insolvent or had committed an act of bankruptcy."

Section 302 of the Bankruptcy Act provides that the provisions dealing with cases filed under Chapters I–VII of the Bankruptcy Act apply to Chapter XI cases to the extent that they are not inconsistent or not in conflict with the provisions of the Chapter.

■ There is nothing in § 68 of the Act which is inconsistent with any provision of Chapter XI as far as the right of set-off relates to a pre-petition claim of a debtor and a pre-petition claim against a debtor. In such situations, there is no question that a mutuality is present and if set-off is not allowed, it is only because of equitable reasons. *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974).

■ On the other hand, when a pre-petition creditor seeks to set-off its claim against the claim of a debtor-in-possession which arose in its favor after the commencement of a case, there is no mutuality because the debtor-in-possession is an entity different and distinct from the debtor itself. *In re The Eli Witt Company*, —— B.R. ——, Case No. 79–896 T (M.D.Fla.1980); *In re A's Plumbing Company, Inc.*, Case No. 78–226 T (M.D.Fla.1979); *In re Big "D" Corporation*, CCH Bankr.Rptr. § 65,450 (M.D.Fla.1974). The equitable consideration which compels a disallowance to the right of set-off was most frequently recognized in rehabilitation proceedings. In such cases the courts usually concluded that to permit a set-off would be detrimental and counter-productive to the overall aim of the rehabilitation process. *Baker v. Gold Seal Liquors, Inc., supra.*

■ This is not the case, however, in the present instance because T & B is defunct for all practical purposes; it is no longer a viable functioning business entity, and if there will be any plan of arrangement ever effectuated, it will be nothing but a total liquidation of assets, the type of plan generally not condoned and accepted in a pre-Code Chapter XI arrangement proceeding. *Yale Express System, Inc.*, 251 F.Supp. 447 (S.D.N.Y.1965) *vacated on other grounds*, 362 F.2d 111 (2d Cir. 1966). For the reasons stated, set-off is applicable against any monies due and owing to T & B for work performed and earned pre-petition, but not against monies earned by T & B after the commencement of the case which is monies owed to T & B for equipment rental. This is so because, as noted earlier in this situation, mutuality is not present. To be mutual, the debits or credits must be in the same right and between the same parties, standing in the same capacity. 4 *Collier on Bankruptcy*, ¶ 68.04 [2.1] (14th ed.); inasmuch as the equipment rental claim accrued after T & B filed its Chapter XI proceeding, Ballenger cannot assert a set-off against T & B, the debtor-in-possession, for any obligation incurred by T & B prior to the filing of the petition. Therefore, Ballenger's claimed set-off against the equipment rental cannot be recognized.

This leaves for consideration the amount of a set-off to be allowed with regard to the mutual debits and credits between T & B and Ballenger, as existed on the date of the commencement of the case.

■ Before considering the respective contentions of the parties and resolving this controversy in terms of specific dollar amounts, certain additional preliminary remarks are in order. First, the relationship of the parties concerning the four interstate highway projects was not a joint venture, but was the relationship of a general contractor and a subcontractor. Thus, contrary to certain innuendos by T & B, Ballenger was not a fiduciary; owed no duty to T & B to furnish financial assistance either directly or indirectly and there is no evidence in this record that the willingness of Ballenger, to inform the Bank as to the progress payments was a guarantee by Ballenger of the debt owed by T & B to the Bank or arose to the level of a binding commitment.

■ Next, T & B intimates it was Ballenger who breached the contract by not releasing the January progress payments and,

therefore, it was Ballenger's fault that T & B ran out of money, therefore, T & B was excused from any further performance under this contract. This record leaves no doubt and permits no other conclusion that the contract was breached by T & B. Therefore, Ballenger is entitled to have its claim allowed in this proceeding based on the amount of damages actually suffered as a result of the breach of contract by T & B reduced, however, by the amount owed by Ballenger to T & B for work performed, but not paid prior to the commencement of the case.

Proceeding from these premises, one must now consider first the quantum and quality of the proof presented by Ballenger in support of its claim and especially the claim as it relates to each of the four interstate projects. Having found that Ballenger is entitled to a set-off except as to monies due for the equipment rental, the court must consider which items claimed by Ballenger are proper and should be allowed. Once the total claim by Ballenger is determined, the claim shall be reduced by the total amount of credits to which T & B is entitled. Finally, certain adjustments have to be made for the amount of excess overhead claimed by Ballenger and an adjustment for certain other items which cannot be allowed and an upward adjustment of the amount due to Ballenger on each phase of the project for monies due to T & B for equipment rental, item which has been credited by Ballenger which is included in the claim and which cannot be set-off.

The respective contentions advanced by the parties as to the precise amounts which Ballenger is entitled to claim, of course, is widely different and at times confusing and it is difficult to understand. In these instances, the Court has no choice, but to consider whether or not the party asserting a particular claim or credit has carried the burden of proof placed upon it.

## CLAIMS OF THE PARTIES CONCERNING THE FOUR PROJECTS

### SARASOTA NORTH PROJECT

Ballenger contends that it is entitled to damages in the amount of $211,497. This figure according to Ballenger is derived from the net amount of the cost to complete this project, i. e. $3,308,567 less the adjusted contract price, $2,825,192, less certain credits due to T & B, $271,878 which includes monies owed to T & B for equipment rental.

In opposition, T & B points out that the subcontracts which Ballenger entered into with Lee Con Craggs and J. E. Hill after T & B lost the project, reveal that $40,000 was spent for additional project engineering and $118,119.40 was spent for additional embankment work, neither of which were part of the original subcontract with T & B. Thus, according to T & B the amount of the Ballenger loss of $211,497 should be further reduced by the $158,119.40 extras leaving a net loss of $53,377.60. Not satisfied with that, however, T & B further contends that any cost overrun is the result of mismanagement on Ballenger's part.

■ Considering the evidence presented in this record, the Court is satisfied that Ballenger's claim in the amount of $53,-377.60 is a proper amount allowable subject to further adjustments upward for credits previously deducted improperly for equipment rental which is not subject to set-off and a deduction for excess overhead claimed by Ballenger.

### SARASOTA SOUTH PROJECT

The Sarasota South project was the only bonded project. Ballenger contends that it suffered damages in the amount of $298,-095. This figure, according to Ballenger, is derived from the net amount of the cost to complete $3,797,315 less the adjusted contract price, $2,933,928 less certain credits to T & B which includes payment on the bond in the amount of $400,000 plus monies earned by T & B and a change order in the amount of $68,692.

In opposition, T & B takes the position that Ballenger has been fully satisfied by the $400,000 settlement on the bond and is not entitled to any further damages with respect to the Sarasota South project. In addition, T & B contends that Ballenger

entered into a completely different type of sub-contract with Lee Con Craggs to complete the project; one based on an amount not to exceed $1,100,000, but offering incentives for work fully performed below the maximum agreed price of the contract. As such, T & B contends that the subcontract to complete the project is not comparable with the original subcontract, and should not be used as the measure of damages allegedly suffered by Ballenger. In addition, T & B contends that the amount of the change order is $107,552 rather than the $68,692 stated by Ballenger.

■ Having considered the respective contentions of the parties with respect to the Sarasota South project, this Court is satisfied that the $400,000 payment on the bond is merely a credit to be deducted from the damages suffered by Ballenger and the payment does not operate as a full satisfaction of the amount Ballenger claims. This is so because it is a well-known fact that settlements are often lower than the actual loss but are agreed upon in order to avoid the tremendous litigation expense which would surely result if the matter is not settled. The Court is further satisfied that the actual amount of the change order was $107,552 rather than the $68,692 stated by Ballenger. This is so because T & B's records in support of its figure establish this amount, and Ballenger has offered no explanation as to a lesser amount. From this it follows that Ballenger is entitled to a claim on the Sarasota South project in the amount of $259,215 which is the amount claimed less $38,880 additional credit to T & B on its change order. That sum, however, as has been pointed out is subject to an upward adjustment for credit on equipment rental deducted improperly and further reduced by excess overhead expenses.

*CHARLOTTE COUNTY PROJECT*

Ballenger claims that it suffered a net loss in the amount of $325,526. This figure according to Ballenger is based on the net amount of the cost to complete this phase, i. e. $3,445,207 less the adjusted contract price, $2,811,925 less various credits to T &

B for work performed and equipment rental of $307,756. In opposition to the claim, T & B contends that rather than losing money Ballenger actually saved $207,978.55 on the new sub-contracts to complete the project. Thus, on the portion of the contract which Ballenger chose to complete itself, it expended $533,504.55 in excess of the contract price for the same performance. In addition, T & B points out that any overruns on liquid asphalt, on the project under the Ashland-Warren contract, will be adjusted by the DOT under the prime contract. Thus, any loss allegedly suffered by Ballenger, if there was any, is the result of mismanagement by Ballenger.

■ Having considered the record, this Court is satisfied that inasmuch as the Charlotte County project was only 14% complete as of the date of termination, cost overruns are quite common place and the $325,526 claimed by Ballenger is not totally unreasonable on a job of this magnitude. Even though Ballenger saved in excess of $200,000 on a portion of its original contract by contracting with White Construction Co., this Court is satisfied that due to the fact that 86% of the project remained incomplete, the presumptive correctness of the $325,526 claim has not been overcome by anything in this record. This Court is, therefore, satisfied that the $325,526 should be allowed subject to an adjustment upward for credits on equipment rental which is not subject to set-off less the amount of excess overhead.

*LEE COUNTY PROJECT*

Ballenger contends that it is entitled to a claim in the amount of $479,738. This figure according to Ballenger is the cost to complete this phase, i. e. $3,286,269.50 less the adjusted contract price, $2,718,079 less certain credits to T & B for work performed and equipment rental in the amount of $39,773.

In opposition, T & B contends that Ballenger is not entitled to damages in any amount because any cost overruns are the result of Ballenger's mismanagement. In support of its proposition, T & B presented

a copy of a contract between Ballenger and J. E. Hill for $96,617 which is identical to the work to be performed originally by T & B on the contract, and because Ballenger chose to complete the remaining balance of the sub-contract itself, it should have kept a tighter rein on the costs. In addition, T & B points out that this project was up-to-date and at termination was 82% complete. Thus, according to T & B, Ballenger exceeded a reasonable cost to complete on the remaining 18% of the contract. In addition, T & B claims that proper amount of credit for work performed should be $80,951.79 rather than the $39,713 asserted by Ballenger.

▮ Having considered the respective contentions of the parties, this Court is satisfied that the overall presumptive validity of Ballenger's claim has not been overcome by any evidence presented by T & B. Therefore, although there is a very significant and perhaps unusually great amount of costs incurred to complete the remaining 18% of the Lee County project, the court is constrained to find that the $495,516 should be allowed subject again to an adjustment upward for equipment rental improperly deducted previously as a set-off, and adjusted downward for excess overhead. With respect to the dispute concerning monies owed to T & B for work performed, this Court is satisfied that rather than accepting either T & B's or Ballenger's figures, the better solution is to consider the amount of the retainages which is customarily 10% of the project cost. The retainages in question total $5,655 for the relevant period. Thus, the amount of work performed by T & B, for which it was not paid, is $56,550 which is an additional $16,777 over the figures stated by Ballenger. Inasmuch as the starting figures used by this Court in computing the amount of Ballenger's claim includes a deduction for work performed by T & B, it is necessary to deduct $16,777 from the amount of Ballenger's claim thus, leaving a balance of $479,738 on the Lee County project.

▮ From all the above, it follows that Ballenger has established a valid claim in the amount of $53,377.60 for Sarasota North; $259,215 for Sarasota South; $325,526 for Charlotte; and $479,738 for Lee County; or a total of $1,117,856.60. From that total the amount of excess overhead on the four projects must be deducted. At this juncture it must be pointed out that Ballenger's amended claim seeks overhead of 8% and is requested in the amount of $525,350 which is some $465,403.25 higher than the amount originally sought by Ballenger for overhead. In light of the fact that Ballenger did not hire additional office personnel and would have had to bear the cost of overhead even if there had been no breach by T & B, the amount sought for this item by the amended complaint is unwarranted and not justified. Therefore, this Court is satisfied that to the extent the amended overhead claim exceeds the original claim, to wit: $465,403.25, that amount should further be deducted from Ballenger's allowable claim thus reducing the Ballenger claim to $652,453.35. In addition, however, inasmuch as the claimed losses on each of the projects took into account credits to T & B for equipment rental and deducted the amounts from the claim, those deductions were improper because set-off cannot be permitted. Thus, the $652,453.35 claim of Ballenger should be increased an additional $56,934 for equipment rental which represents the total allowable claim in the amount of $709,387.35.

▮ Lastly, the contention of T & B that even if Ballenger has a provable and allowable claim in this proceeding, the claim should be subordinated to the claim of the other creditors for equitable reasons. Of course, if this request is granted the claim of Ballenger is disallowed for all practical purposes. This is so that the likelihood to pay unsecured creditors in full is nil, therefore, no payment can be made to Ballenger if subordination is recognized. However, there is no persuasive evidence in this record which would justify subordination on equitable grounds and, of course, the record is totally devoid of any evidence of subordination based on contract.

In accordance with the foregoing, Ballenger has an allowable claim against T & B in the amount of $709,387.35. The Court is further satisfied that on T & B's counterclaim, Ballenger owes T & B $56,934 for equipment rental which must be paid in full because this claim is not subject to any set-off.

A separate final judgment will be entered in accordance with the foregoing.