**In re FIERO PRODUCTION, INC. Debtor.**

**FIERO PRODUCTION, INC., Plaintiff,**

**v.**

**CONOCO, INC., et al., Defendant.**

**Bankruptcy No. 87–10585.**

**Adv. No. 87–1113.**

United States Bankruptcy Court, W.D. Texas, Austin Division.

June 16, 1989.

---

James V. Hoeffner, Alvis, Carssow & von Kreisler, Austin, Tex., for Fiero.

James F. Tillson, Legal Dept., Houston, Tex., for Conoco, Inc.

## DECISION AND ORDER

LEIF M. CLARK, Bankruptcy Judge.

Fiero Pröduction, Inc., plaintiff, sues Conoco, Inc., defendant, under three theories: 1) Deceptive Trade Practices Act (Tex.Bus. & Com.Code Ann. §§ 17.46(b)(5), (14), (23); 17.50(a)(3)); 2) statutory fraud in real estate and stock transactions (Tex.Bus. & Com.Code Ann. § 27.01); and 3) common law constructive fraud. Fiero seeks, *inter alia*, actual, special, consequential, treble, and exemplary damages. Conoco counter-

claims with a recoupment action against Fiero.

After careful scrutiny of the facts, this court finds that Conoco did not perpetrate fraud, either statutory or constructive, on Fiero.

As to recoupment, this Court finds that Conoco is entitled to recover the overpayment it made to Fiero out of the funds on hand.

### Jurisdiction

This court has jurisdiction over this proceeding under the precedent announced in *Matter of Wood*, 825 F.2d 90, 93 (5th Cir. 1987). This is a non-core proceeding, but in the absence to objections to the contrary, the parties are deemed to have consented to the entry of a binding final order by this court. 28 U.S.C. § 157(c)(2); *In re Men's Sportswear, Inc.*, 834 F.2d 1134, 1137–1138 (2d Cir.1987).

### Facts

This case concerns a working interest in an oil and gas unit, the Nix South Unit, located in Andrews, Texas. Conoco, the defendant, owned and operated the unit. Due to an economic depression in the Texas oil industry, and because Conoco deemed the unit to be of marginal value, Conoco decided to sell the unit through a bidding process.

Conoco entered into an agreement to sell its interests to Darrell Jackson, one of the working interest ("WI") owners.[1] However, the sale did not close, and Conoco continued to actively solicit for a buyer. In September 1986, Conoco gave notice to the WI owners that it was withdrawing as the unit operator. In November or December of 1986, Fiero entered into negotiations with Conoco to purchase Conoco's interest. About January 30, 1987, Conoco mailed written notices to the WI owners that Fiero was going to purchase Conoco's interest. In the letter, Conoco recommended that Fiero be elected the unit operator. Ballots were included with the notices. When the

---

1. Jackson had been a party to this suit, but was    dismissed prior to trial.

ballots were returned, over 51%, but less than the requisite 65%, of the working interest owners approved Fiero as operator. Nevertheless, Fiero began operating the Nix South Unit and did so for approximately one month.

On February 19, 1987, Conoco executed an assignment of its interest to Fiero. Mr. Jackson called a WI owner meeting to be held on March 17, 1987. At that meeting, Jackson was elected by more than 65% to be the unit operator. (In an interlocutory summary judgment, this Court found that Fiero had never been elected the unit operator and that Darrell Jackson was in fact the unit operator).

Fiero contends that, throughout these negotiations up to the closing of the deal, Conoco had assured Fiero that Fiero would become the unit operator. The position of unit operator is evidently of extreme economic value to its holder, and it was an "asset" Fiero coveted.

The procedure to become unit operator is dictated by a document known as the unit operating agreement ("UOA"). This document was drawn from a form drafted by Conoco over a decade prior to the closing. Sections 4.3 and 6.3 of the operating agreement control voting procedures. Section 4.3, titled "Voting Procedure" requires that unless provided otherwise, "all matters shall be decided by an affirmative vote of sixty-five percent (65%) or more voting interest." Section 6.3., titled "Unit Operator" requires that in the selection of a successor operator, "[i]f the Unit Operator that is removed votes only to succeed itself, the successor Unit Operator may be selected by the affirmative vote of at least fifty-one percent (51%) of the voting interest remaining after excluding the voting interest of the Unit Operator that was removed."

The apparent contradiction between these two sections as to voting requirements is the genesis of the plaintiff's causes of action. Fiero contends that it was led to believe by Conoco that Fiero needed only 51% of the WI owners to be elected operator, not the 65% specified in section 4.3. Fiero also claims that, al-

though the assignment would only transfer Conoco's 44% to Fiero, Conoco assured Fiero it would have little difficulty acquiring 51%. Fiero argues, in effect, that Conoco's representations to Fiero during the negotiations were the producing cause of Fiero's reliance on section 6.3.

Conoco retorts that Fiero never told Conoco that a condition precedent to the sale by assignment was that Fiero become operator of the unit. The assignment actually executed by Fiero and Conoco recited no such contingency. Conoco further argues that any statements regarding operatorship were neither material nor relied upon by Fiero. Conoco contends that Fiero, as a previous operator, had the experience, ability and capacity to determine on its own the procedure for appointment of the operator required under the UOA. Fiero's attorney was given two days of access to examine title to the property, including a review of the UOA. Following standard industry practice for resigning operators, Conoco mailed notices to all of the working interest owners advising them of the planned sale to Fiero. Though Conoco recommended that Fiero be elected unit operator, it was Fiero's responsibility to actually obtain those votes.

## LEGAL ISSUES

### I. FRAUD

#### A. Deceptive Trade Practices Act

■ To be actionable under the Deceptive Trade Practices Act ("DTPA"), a misrepresentation must be a producing cause of the injury or damage. *See McCrea v. Cubilla Condominium Corp.*, 685 S.W.2d 755 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). Some Texas courts have described producing cause as factual cause. *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206 (Tex.1985), *Dubow v. Dragon*, 746 S.W.2d at 860 (Tex.App.—Dallas 1988, no writ); *Riojas v. Lone Star Gas Co.*, 637 S.W.2d 956, 959 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.); *Danny Darby Real Estates v. Jacobs*, 760 S.W.2d 711, 716 (Tex.App.—Dallas 1988, writ requested, Jan. 4, 1988). Producing cause means

an efficient, exciting or contributing cause. *Texas Indemnity Insurance Co. v. Staggs*, 134 Tex. 318, 134 S.W.2d 1026, 1028 (Tex. Com.App.1940). Producing cause lacks the element of "foreseeability" embraced by the standard of proximate cause. *Riojas*, 637 S.W.2d at 959.

■ Were Conoco's representations the "producing cause" of Fiero's misunderstanding or confusion in regards to its becoming operator upon organization of the Nix–South? Although it is generally said that plaintiffs in a DTPA action do not have to demonstrate reliance on the prohibited conduct, *Weitzel v. Barnes*, 691 S.W.2d 598, 600 (Tex.1985), the prohibited conduct might not be the *producing* cause of the damages if there has been no reliance. In *Higginbotham & Associates, Inc. v. Greer*, 738 S.W.2d 45, 49 (Tex.App.—Texarkana 1987, writ denied), a defendant's alleged misrepresentations concerning expertise in placing insurance for bowling centers was found not to be the producing cause because the plaintiff had not relied on the alleged misrepresentations when purchasing insurance from the company that later became insolvent. In *Riojas v. Lone Star Gas Co.*, 637 S.W.2d 956, 959 (Tex.App.—Fort Worth 1982, writ ref'd n.r.e.), plaintiffs' near-asphyxiation when plaintiffs brought into their dwelling a bucket of coals was held to have been caused by plaintiffs' negligence, which broke the causal connection to defendant's termination of gas services.

In *Dubow v. Dragon*, 746 S.W.2d 857 (Tex.App.—Dallas 1988, no writ), a married couple bought a home for $445,000 after having hired two professionals to inspect the dilapidated interior. The inspection was a condition precedent to the closing of the sale. The specialists estimated that repairs would be $4,000. The couple, ostensibly because of potential problems, refused to purchase the house unless the price was reduced, not by $4,000, but by $17,500. The modified contract read:

> After careful inspection of the house, and with professional opinions [w]e feel that the house will need extensive on-going maintenance.... We will take the home as is, WITH ALL CONTINGENCIES REMOVED.

*Id.* at 861 (emphasis in original). The plaintiffs argued that they had confronted the defendants with certain problems, but that the defendants had assured them that this was a good house with no problems. The court, referring to the contract clause, concluded that the defendants' actions were not the producing cause, but that the plaintiffs' inspection of the house's condition ...

> constituted a new and independent basis for the purchase which intervened and superseded the [defendants'] alleged wrongful act ... it is obvious that the [plaintiffs] did not rely on any alleged misrepresentations or failures to disclose since the [plaintiffs] hired experts to inspect the house, and they relied on these experts in negotiating and obtaining a contract modification affording them a reduced purchase price.

*Dubow v. Dragon*, 746 S.W.2d at 860 (emphasis added).

We have a similar situation here. Fiero, if indeed it believed in the 51% threshold, relied not on Conoco's representations, but on those of Fiero's own employees and agents. First and mainly, James Leeton, Fiero's attorney, inspected relevant documents, including the UOA, prior to the closing. Further, Mr. Leeton communicated his impressions to Mr. Hill prior to the closing. Although Mr. Leeton equivocated on whether he informed his superiors of the potential conflict between sections 6.3 and 4.3, he admits that he should have done so pursuant to his legal duties owed to Fiero. Mr. Leeton conceded that he should have prepared Fiero for the worst-case scenario, namely a 65% threshold. He also admitted that he found the UOA's voting requirements unusual and unique. Perhaps Fiero is correct that the 65% requirement was not the industry standard for operating agreements, but, Mr. Leeton was aware of the agreement's intricacies. As in *Dubow*, this inspection constituted a new and independent basis for the purchase, which intervened and superseded the alleged misrepresentation by Conoco.

Fiero claims that during the negotiations and before the closing of the deal a relationship beyond that of a fiduciary developed between Fiero and Conoco. In such a relationship, the argument goes, any representations by Conoco employees, regardless of their positions at Conoco and regardless of the circumstances surrounding the alleged misrepresentations, engendered reliance on Fiero's part. Moreover, Fiero contends this reliance was actively solicited and abetted by Conoco. This court does not believe, however, that Fiero reposed more trust and confidence in Conoco's employees than in its own legal counsel. Although Mr. Hill occasionally socialized with Fiero employees during the negotiations, he must have recognized these social contacts as mere conventions of the business world and not the creation of a fiduciary relationship rivaling or superseding the relation between Fiero and its own attorney. Perhaps Mr. Hill was a novice in the oil business, but he was a seasoned entrepreneur.

Fiero also contends that Joe Kulinski, a Conoco employee, guaranteed prior to the closing that Fiero would become the operator. It is true that Conoco cannot disavow Mr. Kulinski's representations as being *ultra vires. Royal Globe Ins. Co. v. Bar Consultants*, 577 S.W.2d 688, 694 (Tex. 1979). However, Mr. Kulinski's testimony is confused as to what he communicated to Fiero and as to whether his communications were prior to the closing. Further, this court does not believe that Fiero would have relied on these alleged representations without verifying them with Mr. Kulinski's superiors or without demanding that the representations be incorporated into the relevant documents. Even a person of ordinary suspicion and intelligence who did not stop to analyze the relevant documents in detail, but who was governed by appearances and general impressions alone (the often-stated standard in DTPA actions, *see Nagy v. First Nat. Gun Banque*, 684 S.W.2d 114, 116 (Tex.App.—Dallas [5th Dist.] 1984, writ ref'd n.r.e.) would nonetheless have found his or her attorney's opinion at least relevant, if not decisive. Moreover, such a person would have

to at least wonder why the alleged guarantee of operatorship was not recited in the sundry documents executed. Indeed, Doug Hill, a major officer with Fiero, testified that had he even suspected the possibility that Fiero would not become the operator, Fiero would not have closed the deal. It stretches credulity that Mr. Leeton's warnings did not arouse Fiero suspicions.

Joe Neal, Fiero's expert witness, testified that a purchaser of a majority working interest in a well typically wants to be the operator. However, to say that Fiero wanted to be operator of the Nix–South Unit does not mean that Fiero made fulfillment of that desire a condition precedent to the agreement. "The fact that persons are injured, for whatever reasons, does not give rise to any assurance that compensation (under the DTPA) for those injuries will be recovered." *Riojas v. Lone Star Gas Co.*, 637 S.W.2d at 956.

### B.   Common law and statutory fraud

Since there is no causal link between Conoco's alleged misrepresentations and Fiero's alleged damages, this court must find that, as a matter of law and fact, Fiero's constructive fraud and statutory real estate fraud actions fail as well.

## II.   RECOUPMENT

Conoco counterclaims that Fiero has been unjustly enriched. Conoco argues that in addition to the Nix–South Unit, it also had a business relationship with Fiero regarding the University 14–7 well in Martin County Texas. Prior to November 1986, Conoco had made production payments to Fiero for purchases from the University 14–7 well. Around November 1986, an entity known as SBS General Services, Inc. became the proper party entitled to receive production payments from the University 14–7 well. Conoco inadvertently paid $14,408.83 to both SBS and Fiero for the November and December 1986 production. Conoco seeks to apply $7,309.20, money previously collected from Fiero and which it now holds in suspense, to this alleged debt. In addition, Conoco seeks an

affirmative award of $8,099.63, plus legal fees, costs, and interest on the debt.

■ Recoupment is a defense as well as a counterclaim and, unlike setoff, does not involve the concept of mutuality of obligations. *In re Boyd*, 96 B.R. 694, 695 (Bankr.N.D.Tex.1989); *In re Buttes Resources Co.*, 89 B.R. 613, 615 (S.D.Tex. 1988); *In re Buttes Gas and Oil*, 72 B.R. 236, 238 (Bankr.S.D.Tex.1987); *Howard Johnson, Inc. v. Tucker*, 157 F.2d 959 (5th Cir.1946); *In re Boyd*, 96 B.R. 694 (Bankr. N.D.Tex.1989). *See also* Wynn, *Freeze and Recoupment: Methods for Circumventing the Automatic Stay?* 5 Bankruptcy Developments Journal 85 (1988).

■ Defendant's invocation of the doctrine is understandable since recoupment, originally an equitable rule of joinder, is an exception to the rule that no creditor of a bankrupt shall receive preferential treatment. *In re NWFX, Inc.*, 864 F.2d 593, 597 (8th Cir.1989); *In re B & L Oil Co.*, 782 F.2d 155, 157 (10th Cir.1986); *Electronic Metal Products, Inc. v. Honeywell, Inc.*, 95 B.R. 768, 770 (D.Colo.1989). Recoupment allows the creditor to extinguish the mutual claims irrespective of their bankruptcy status. *Lee v. Schweiker*, 739 F.2d 870, 875 (3rd Cir.1984); *In re Buttes Resources Co.*, 89 B.R. 613, 614 (S.D.Tex.1988). The defense of recoupment survives as long as the cause of action upon the claim exists. *Pennsylvania R. Co. v. Miller*, 124 F.2d 160, 162 (5th Cir.1942). Recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim. *In re Boyd*, 96 B.R. at 695. It is used to reduce liability owed to the other party. In fact, recoup is derived from the French "recouped" which means to cut back. Websters New English Dictionary, 1979.

Although it is said to be mainly a defense, courts have allowed recoupment by way of declaratory judgment. *See In re B & L Oil Co.*, 782 F.2d 155 (10th Cir.1986). In *B & L Oil*, a creditor initiated declaratory action seeking recoupment from a Chapter 11 debtor. The debtor executed an oil division order in favor of plaintiff, and the creditor obtained the right to purchase unspecified amounts of crude oil that the debtor produced. The creditor asked that the court declare that the creditor properly recouped its overpayment to the debtor and that the creditor would be entitled to recoup from future purchases the remaining amount it had overpaid. After surveying the relevant case law, the court found that the oil division order was a single contract, and that the overpayments were

> much like advance royalties to a writer or a musician. They are similar to the Medicare overpayments to a hospital, which a court allowed to be "recouped" against payments owed the hospital for patients it treated after filing chapter 11 bankruptcy proceedings. *See, In re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. [427] at 433 [Bankr.S.D.N.Y. 1982].... Further, bankruptcy courts apply recoupment as an equitable doctrine. Here we face a question of unjust enrichment. The situation before us is not one in which the creditor seeking relief consciously made a loan, extended credit, or made payments required by a contract, as did the bankruptcy's ordinary creditors. Ashland [the creditor] paid the sums to B & L by mistake. Although common sharing may be required in some mistake cases by the bankruptcy laws' cleavage rules, allowing B & L's other creditors to share in this money would give them a windfall, a classic case of unjust enrichment.

*Id.* at 158–159.

■ Fiero argues that *B & L Oil* is not the law of the State of Texas. Fiero contends that the controlling case is *Houston Lighting & Power Co. v. Liberty Pipeline Co.*, 72 S.W.2d 393 (Tex.Civ.App.—Galveston 1934, writ ref'd). The court in *Houston Lighting* concludes that "each separate delivery and acceptance of oil under a division order is a separate transaction." *Id.* at 398. However, the Tenth Circuit in *B & L Oil* expressly recognizes that the creditor's overpayment to the debtor is not essentially a defense to the debtor's current claims for payment on post-bankruptcy deliveries, and that "the obligations are easily

*separable and independently determinable.*" *Id.* at 158 (emphasis added). The court continues

> Nevertheless, the instant case is analogous to other bankruptcy cases in which recoupment has been allowed. The overpayments under the division order are much like advance royalties to a writer or a musician. They are similar to the Medicare overpayments to a hospital, which a court allowed to be "recouped" against payments owed the hospital for patients it treated after Chapter 11 bankruptcy proceedings. Although there the contracts expressly provided for repayment of advances or overpayments, application of an equitable doctrine should not depend on whether the parties expressly anticipated the problem.

*Id.* at 158–159 (citations omitted). Thus, the Tenth Circuit allowed recoupment notwithstanding that "the obligations are easily separable and independently determinable." *Fiero concedes that B & L Oil is factually on point.* Like the contract between the debtor and the oil company which the Tenth Circuit found significant, the provision in Conoco's assignment to Fiero contains an express provision that Fiero will sell the oil from the unit to Conoco. Therefore, this Court will follow circuit court precedent and will allow Conoco to recoup its past overpayments to Fiero. In addition, the court will permit Conoco to recover the balance of its overpayment, $8,099.63 from future runs. The court will also permit Conoco to recover interest on the overpayment at the judgment rate of 8.85 percent. All other relief requested by Conoco with regard to its recoupment claim is denied.

So ORDERED.