**In re Phillip R. VAUGHTER and Peggy Vaughter, Debtors.**

**Bankruptcy No. 88–13389FM.**

United States Bankruptcy Court, W.D. Texas, Austin Division.

Dec. 29, 1989.

**230**

Frederick E. Walker, Austin, Tex., for debtor.

Benjamin Hathaway, Hilgers & Watkins, Austin, Tex., for creditor.

Stanley W. Wright, Arlington, Tex., trustee.

## MEMORANDUM OPINION

FRANK R. MONROE, Bankruptcy Judge.

This matter comes before the Court on a Motion For Contempt And Sanctions Of Defendant (the "Motion") wherein the Debtors complain about certain actions taken post-petition by Southwestern Bell Yellow Pages, Inc. ("SWB") in repaying to itself post-petition an indebtedness which the Debtors incurred prepetition by reason of certain advances which SWB made to Phillip Vaughter against his commissions to be earned in the future. The facts are not in substantial dispute and the issue is whether or not the repayment by SWB to itself of its prepetition commission advances to the Debtor out of the Debtor's post-petition commission earnings constitutes a legal recoupment or an unauthorized setoff.

## FINDINGS OF FACT

1. The Debtors (hereinafter the Debtors will be referred to as Debtor) filed a voluntary petition under Chapter 7 of the Bankruptcy Code on November 15, 1988.

2. For several years prior to filing, Debtor was, and at the present time still is, employed by SWB as an Account Specialist.

3. The employment relationship of the Debtor and SWB during all relevant times is governed by SWB Exhibit 1, the 1986 Labor Agreement between the Communications Workers of American and Southwestern Bell Publications, Inc., specifically Article XXVII therein (hereinafter referred to as the "Employment Contract").

4. The Debtor's right to payment for services rendered under the Employment Contract is on a commission only basis.

5. In April, 1988, the Employment Contract was amended pursuant to recommendations made at a Joint Company—Union Conference Committee on Working Relationships to provide a plan to provide improved cash flow to the Account Specialists (the "Amendment").

6. The Amendment was made for the purpose of providing a voluntary plan pursuant to which improved cash flow to the Account Specialist could be effected. In essence, the Amendment provided a procedure pursuant to which advances upon commissions to be earned in the future by an Account Specialist (in addition to those standard advances provided for in the Employment Contract) could be made so that such Account Specialist would not have to wait until the final accounting relative of each "Market Canvass" upon which the Account Specialist worked in order to be paid for his or her work thereon. The Amendment was to provide a manner of putting the receipt of commissions by all Account Specialists on a more even flow throughout the term of any particular Mar-

ket Canvass. Participation, when offered by SWB, was voluntary, i.e. an Account Specialist did not have to participate.

7. Account Specialists are routinely assigned to various and particular Market Canvasses. A separate Market Canvass is conducted for each Yellow Page book published by SWB, that is, the Market Canvass for the Dallas Yellow Page book occurs separate and apart from the Market Canvass for the Austin Yellow Page book. Additionally, these Market Canvasses routinely occur at different times and the starting and completion dates of certain Market Canvasses at times overlap. An Account Specialist is routinely assigned to particular Market Canvasses and has an assignment of particular clients (advertisers) to service with regard to each Market Canvass. Not all Account Specialists work on the same Market Canvasses. Advances to Account Specialists against commissions under both the Employment Contract and the Amendment are accounted for by SWB on each separate Market Canvass.

8. It appears that the Debtor has been treated the same as all other Account Specialists with regard to assignment to Market Canvasses as well as assignment of clients to be serviced by each particular Market Canvass.

9. At any one point in time SWB has a number of Market Canvasses being conducted. Further, an Account Specialist may be working on more than one Market Canvass at the same time although that is the exception rather than the rule.

10. Debtor, during the year 1988, worked on the following Market Canvasses in the following sequence: Houston Metro East (January, February and part of March), Sequin (part of March and part of April), Bastrop (part of April), Austin South (May through September), Temple (part of October), Hillsboro (part of October and part of November), and Corpus Christi (part of November and part of December). As of the date of the filing of this case, Debtor was in the middle of the Corpus Christi Market Canvass. In 1989, the Debtor worked on the following Market Canvasses in the following sequence:

Waco (January and part of February), Sequin (part of February), Hillsboro (part of February and part of March), Austin South (part of March, part of April, all of May, June, July, August and part of September), Waco (part of April), Temple (part of September), and Houston Metro Central (October and November).

11. In May, 1988, SWB made an advance to the Debtor under the Amended Employment Contract procedures in the amount of $10,588.00 against commissions to be earned by him under the Austin South Market Canvass. An additional $750.00 was advanced thereafter in August, 1988 against the Debtor's commissions in the same Market Canvass. Accordingly, on the date of the institution of this case, the Debtor was indebted to SWB in the amount of $11,238.00 for commission advances made against his commissions to be earned in the Austin South Market Canvass pursuant to the Amendment.

12. Article XXVII of the Employment Contract at Section 3, Subparagraph (b) provides for a "true up" for each Market Canvass to occur on the 25th of the month in which the 60th day after that Market Canvass has "closed to the public" occurs. The Contract specifically provides that:

"When actual commissions earned are determined, all advanced commission payments will be deducted from the total amount due the specialist prior to payment. If that deduction results in a deficit, and such deficit exceeds the payments due for that month *from all sources*, the excess will be deducted from the *next month's commission payment*." (Emphasis added.)

13. True up for the Austin South Market Canvass occurred on November 25, 1988, i.e. after the filing of this case on November 15, 1988.

14. Subsequent to the filing of the Chapter 7 case, SWB paid itself back out of commissions earned by the Debtor the following sums on the following dates:

A. $1,902.59 on November 25, 1988,

B. $294.98 on December 25, 1988,

C. $3,834.67 on January 25, 1989,

D. $1,749.17 on February 25, 1989, and

E. $1,746.30 on April 25, 1989,

for a total of $9,527.71. It is unclear from the evidence whether and to what extent the amounts set forth above constituted commissions earned by the Debtor from the Austin South Market Canvass although such should be able to be easily determined from SWB's records.

15. It is unclear from the evidence whether or not the remaining balance of $1,702.29 has been paid to SWB by additional withholdings from the Debtor's commissions.

16. Payments A through D above were effected by SWB prior to any knowledge of the Bankruptcy Case. Payment E above was made after SWB had knowledge of the proceeding.

17. After SWB learned of the Debtor's bankruptcy, all Account Specialists except the Debtor were offered further participation in the advance program under the Amendment on at least one occasion.

18. At that time, the Debtor was on the lower end of performance for all Account Specialists in the SWB office in Austin.

19. As clearly testified to by Gail Whitcomb, the Debtor's supervisor at SWB at the time, the offer extended to all other Account Specialists pursuant to the Amendment (as set forth in Finding No. 17 above) would have been offered to the Debtor but for the fact that he had filed bankruptcy. The Debtor's performance (or lack thereof) would have been a factor only in determining the amount of the advance offered to the Debtor.

20. There is no evidence of malice or vindictiveness on the part of SWB in any of the actions they took.

### ISSUES

1. Is SWB's taking of the Debtor's commissions post-petition to pay back prepetition advances against those commissions permissible as a recoupment or impermissible as a setoff?

2. Did SWB violate 11 U.S.C. § 525(b) by discriminating with respect to the employment of the Debtor when it failed to offer to the Debtor the same privileges under the Amendment which it made available to all other Account Specialists? If so, what is the proper amount of damages?

### CONCLUSIONS AND DISCUSSION

1. *Recoupment v. Setoff.* As pointed out by both parties in their briefing "the distinction between a recoupment and a setoff is that recoupment, unlike a setoff, does not involve the concept of mutuality of obligations and arises out of single transaction between the creditor and the debtor". *Sapir v. Blue Cross/Blue Shield, (In Re Yonkers Hamilton Sanitarium, Inc.),* 34 B.R. 385, 386 (S.D.N.Y. 1983). Further, recoupment has been defined as "the setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim. *In Re American Central Airlines, Inc.,* 60 B.R. 587, 590 (Bankr.N. D.Iowa 1986), citing *Collier on Bankruptcy,* Section 553.03 (15th ed. 1981) (emphasis in original). The concept of recoupment as a means for the assertion of a legal or equitable right resulting from a counterclaim out of the same transaction has been recognized in the Fifth Circuit. *Howard Johnson, Inc. of Florida v. Tucker,* 157 F.2d 959, 961 (5th Cir.1946). Clearly recoupment rests on equitable principles that arose for the "purpose of settling both sides of a transaction at once as a mutual matter". *Howard Johnson,* supra at 961–62.

Plainly stated, recoupment is the determination of the rights of parties to a single transaction so as to determine the net liability one to the other out of that single transaction.

Setoff, on the other hand, goes to the treatment of mutual debts existing between the debtor and creditor which arise out of different transactions. *Lee v. Schweiker,* 739 F.2d 870, 875 (3rd Cir.1984); *In Re Buttes Resources Co.,* 89 B.R. 613, 615 (S.D.Tex.1988). Both setoff and recoupment are counterclaims and, outside of bankruptcy, the distinction may not neces-

sarily be that important. In bankruptcy, however, the distinction becomes vital as 11 U.S.C. § 553 codifies and governs the doctrine of setoff; whereas the Code is silent with regard to recoupment. This has been interpreted by the courts to mean that the recoupment claim is therefore independent of the setoff rights under 11 U.S.C. § 553 and not restricted thereby. *In Re B & L Oil Co.*, 782 F.2d 155, 157 (10th Cir.1986); *In Re American Central Airlines, Inc.*, supra at 590; *In Re Fiero Production, Inc.*, 102 B.R. 581, 587 (Bankr.W.D.Tex. 1989); *In Re Mohawk Industries, Inc.*, 82 B.R. 174, 176 (Bankr.D.Mass.1987); and *In Re Clowards, Inc.*, 42 B.R. 627, 628 (Bankr. D.Idaho 1984).

The foregoing generalized statements of law are easily recited; however, they are difficult to apply to fact situations such as the current one.

Cases involving single transaction contracts to which recoupment has clearly been correctly applied are those such as *In Re Buttes Resources Co.*, supra. (operating agreement between oil field operator and working interest owners under a particular mineral lease held to be a single contract governing recurring transactions so that operator could deduct from proceeds of post-petition production the expenses owed by a working interest owner relating to earlier prepetition production from the same wells); *In Re Clowards*, supra. (recovery by trustee of balance due under construction contract which was breached by the debtor resulting in a competing claim was denied on the basis that other party was entitled to recoupment); *Waldschmidt v. CBS, Inc.*, 14 B.R. 309 (D.C.Tenn.1981) (post-petition proceeds from recording contract made prior to bankruptcy allowed to be recouped by creditor against advances made prepetition advances which exceeded the prepetition receipt of royalties under such recording contract); *In Re B & L Oil Co.*, supra. (creditor could recoup overpayments made prepetition pursuant to oil division order by withholding money owed for purchases after bankruptcy); and *In Re Yonkers Hamilton Sanitarium, Inc.*, supra. (prepetition overpayments of medicare benefits to a medicare provider under a single continuing provider agreement were allowed to be recouped post-petition).

Cases in which the Court failed to find a single transaction and disallowed the claim for recoupment are *Lee v. Schweiker*, supra (overpayment of old age benefits prior to filing of petition is distinguished as being payment to an individual under a social-welfare statute which is not a contract to which recoupment would apply); *United States v. Norton*, 717 F.2d 767 (1983) (1980 tax refund for the year of filing not allowed to be "setoff" against previous years tax liability); *United States v. Wall*, 60 B.R. 512 (Bankr.W.D.Kentucky 1986) (U.S. Army's prepetition pay advances and overpayments constitute "debts" not able to be setoff against post-petition pay as no right of recoupment exists).

Closer to the line of demarcation between setoff and recoupment with regard to the analysis of "same transaction" are *In Re American Central Airlines, Inc.*, supra and *Westinghouse Elec. Corp. v. Fidelity & Deposit Co.*, 63 B.R. 18 (E.D.Pa. 1986). *American Central Airlines* involved subsidy payments to the debtor airline pursuant to a Department of Transportation program to provide essential air services to small cities. In allowing a recoupment of post-petition subsidy payments to extinguish prepetition overadvancements, the court rejected the debtor's contention that each separate trip by the airline to each separate designated city was a single transaction. The court looked to the nature of the contract in reaching its result finding that the contract, among other things, required the debtor "to continue fulfilling all of its service obligations even after it gave notice to terminate, suspend, or reduce the level of air service until a replacement air carrier could be found." *In Re American Central Airlines, Inc.*, supra at 591. The court found that the subsidy rates under the program took into account the totality of the services to be provided to the debtor and accordingly each leg flown by the debtor did not constitute a separate transaction.

In *Westinghouse,* the debtor was a dealer in Westinghouse products. A debt was created by reason of the debtor's failure to pay for merchandise purchased and subsequently sold, i.e. there was no advance of money by Westinghouse. The relationship was then unilaterally changed by Westinghouse so that it billed the debtor's customers directly for the products sold and paid a commission to the debtor on such sales, which change Westinghouse asserted was contemplated in the original dealership agreement. Westinghouse applied commissions owning to the debtor against its prepetition debt. The court found that "the fact that the same parties are involved, and that a similar subject matter gave rise to both claims, ... does not mean that the two arose from 'the same transaction'". *Westinghouse Electric Corp.,* supra. at 21, citing *Lee v. Schweiker,* 739 F.2d at 875. The court additionally based its decision upon the fact that as of the date of filing all that remained under the contract was for the debtor to pay for the goods sold and delivered and that "had the parties terminated their relationship at that time, no adjustments in the form of setoffs or recoupments, would have been possible." *Westinghouse Electric Corp.,* supra at 22. The court accordingly concluded that the parties were engaged in more than one series of transactions and, therefore, recoupment did not apply.

The instant case is close to the line of demarkation. A single contract exists. However, by its nature, it contemplates a series of transactions, i.e. Market Canvasses. Each Market Canvass is separately accounted for by SWB with regard to commissions advanced to or earned by each Account Specialist working on each Market Canvass. Further, a separate "true up" for each Account Specialist at the end of each Market Canvass is conducted. It is at true up that SWB determines the amount of commissions actually earned by each Account Specialist for each Market Canvass. That amount is then compared with the amount advanced to each Account Specialist during the time he or she worked on that particular Market Canvass. The amount advanced is then "recouped" by

SWB and the Account Specialist is paid the difference, if any. If after recoupment, SWB is still owed money (i.e. it overadvanced money to the Account Specialist on that Market Canvass), then such amount is repaid to SWB from other sources.

SWB argues that its right of recoupment must extend to these other sources under the Employment Contract so that the debtor will not get paid twice for the same work. That would constitute unjust enrichment. Debtor argues that the prepetition advances constitute a claim as defined in 11 U.S.C. § 101(4) and since there was liability on such claim by the Debtor, that such claim constituted a "debt" under 11 U.S.C. § 101(11) which was discharged by the order of discharge entered in this case and that the policy in favor of a fresh start for individual debtors is so strong that no recoupment at all should be allowed in this case.

█ Clearly the issue for this Court is to determine which commissions payable to the Debtor can be recouped by SWB as being produced from the same transaction against which they were advanced. Just as clearly the answer must come from an analysis of the Employment Contract and the Amendment.

The Employment Contract and its Amendment constitute a contract for personal services. As such, it is inherently different than an oil division order, a construction contract, a royalty contract, or an oil field operating agreement. Further, to the extent certain of the cases allowing recoupment have done so on the basis that an executory contract was involved which must be either totally assumed or totally rejected, this Court will ignore them since that inquiry is not relevant here. What we have here is a personal services contract whereby SWB employed the Debtor to serve as an Account Specialist to obtain advertising commitments from its customers for placement in various Yellow Page books published by SWB. Under the contract that is accomplished on the basis of separate and distinct Market Canvasses. Each Market Canvass produces a separate Yellow Pages book for a distinct and sepa-

rate area served by SWB. Article XXVII of the Employment Agreement at Section 3, Subparagraph (b) provides for a "true up" for each Market Canvass. This is obviously for the purposes of determining what amount, if any, is owed to the Account Specialist over and above the previous advances which are effectively "recouped" at true up. Specifically, the Contract provides that:

> "When actual commissions earned are determined, all advanced commission payments will be deducted from the total amount due the Specialist prior to payment."

SWB Exhibit 1, Employment Contract, Article XXVII, Section 3(b). The Employment Contract clearly provides SWB the right of recoupment for each separate Market Canvass.

However, when SWB has overadvanced commissions to an Account Specialist on a particular Market Canvass, the Employment Contract gives SWB the right to repay itself any such overadvancement from two other sources. First, SWB is repaid this "debt" from all other sources that the Account Specialist may be entitled to be paid that month (i.e. the month of true up on the Market Canvas in question). Since Market Canvasses do at times overlap and since true up following the closing of each Market Canvass by approximately sixty (60) days, this Court concludes that this provision authorizes SWB to pay itself back the overpayment from money it owes to the Account Specialist at that time for different Market Canvasses. The second place from which SWB can receive payment is from the next month's commission payment to the Account Specialist. This, too, would be commissions owed to the Debtor from different Market Canvasses. By definition, both of these repayments came from the Account Specialist's work on completely different Market Canvasses, and, therefore, from completely different transactions.

Of significance to the Court's opinion is the difference in the intrinsic nature of this personal services contract with those types of contracts to which recoupment has been applied. First, whether or not this an executory contract is irrelevant as personal service contracts are not assumable. Therefore, considerations of unjust enrichment by allowing Debtor the benefits, but not the burdens, of the contract do not apply. Second, the Debtor is not receiving payment twice for services rendered once. If money is still owed SWB after it has recouped from a particular Market Canvass, that is a debt, the same as if a bank had loaned the Debtor the money. That debt is dischargeable. That debt cannot be recouped from other sources. It can only be *repaid* from other sources. Here, bankruptcy has intervened so that such repayment of that debt from other sources is not sanctioned unless it is secured. Third, the instant contract is completely different from a construction contract which provides for the construction of a particular project or an oil field operating agreement which provides for the rights of the parties to a single, continuing, ongoing transaction. Recoupment clearly is intended to apply to them. This contract clearly is structured to accommodate many transactions and the necessary accounting attendant to each one. Fourth, this is not a contract such as the one at issue in *American Central Airlines* where the real quid pro quo in setting the subsidy rates was the totality of the debtor's obligations under the contract. Here, the commission rates are uniform and standard for all Account Specialists. Further, here there is no provision in the contract requiring the Debtor's continued performance. Fifth, much like the situation in the *Westinghouse Electric Corp.* case, here the debtor could quit at any time. Simply because the debtor chose to continue to earn his living with SWB is not sufficient reason, in and of itself, to extend recoupment beyond its intended scope. If, on the date of bankruptcy, the debtor had terminated his employment with SWB, SWB would have not had any way to pay itself out of the Debtor's future earnings other than to recoup any money it owned the Debtor for prior performance on the Market Canvass then in progress against which it had made the advance. That is the protection against

double payment the Employment Contract provides, nothing more. To rule otherwise would not only fly in the face of the very strong public policy of giving individual debtors fresh starts, but would also extend SWB's contractual right of recoupment beyond that which the Employment Contract provides. Sixth, like the *Wall* case, what we are dealing with here are wages in the form of commissions. To allow recoupment from different Market Canvasses would put the Debtor on the horns of a dilemma, either he would have to quit his job to escape repayment of an indebtedness otherwise discharged or he would have to repay the indebtedness. Such is totally inconsistent with the fresh start doctrine.

Accordingly, it is this Court's ruling that:

A. Since the Employment Contract and Amendment provide for commission advances on a Market Canvass basis (otherwise the true up provisions would be meaningless and inapplicable and all of the advances truly would be loans not entitled to be recouped), since the commission advances to the Debtor by SWB under the Amendment were made in May and August 1988, and since the Debtor worked on only one Market Canvass from May 1988 through September 1988, that being the Austin South Market Canvass, such advances were made against commissions to be earned by the Debtor on the Austin South Market Canvass. Under the Employment Contract true up of the Austin South Market Canvass would have occurred on the 25th of November, 1988. To the extent SWB owed commissions to the Debtor by reason of the Austin South Market Canvass on that date, it was and is entitled to recoup those commissions and apply them against their advances. SWB will be entitled to retain this money.

B. To the extent commissions earned by the Debtor from other Market Canvasses prior to November 15, 1988 were payable to the Debtor on November 25, 1988 (the Debtor in October and November 1988, prior to institution of this case, worked on the Temple, Hillsboro and Corpus Christi Market Canvasses), SWB has a secured claim due to its right of setoff under the Employ-

ment Contract. Any action to collect this part of its claim was stayed by 11 U.S.C. § 362 upon the filing of the case. The stay remained in force and effect until the entry of the Debtor's discharge (the Debtor's commissions are not property of the estate). It is no longer in effect. SWB will be entitled to retain this money even though they setoff against it prior to the stay terminating and without Court Order.

■ C. With regard to all subsequent Market Canvasses and the work performed upon them by the Debtor subsequent to the filing of this proceeding, SWB has no enforceable claim either in setoff or recoupment to the commissions it owes to the Debtor by reason of his work thereon. This money must be returned to the Debtor.

D. As only the deduction from the Debtor's commission check on April 25, 1989 in the amount of $1,746.30 clearly occurred after SWB had notice of this bankruptcy, only that particular item is subject to contempt. However, since SWB was acting upon its good faith belief that it was entitled to recoup such funds, this Court will decline to assess punitive damages. However, attorneys fees of $750.00 will be awarded which SWB is Ordered to pay directly to. counsel for the Debtor.

E. To the extent any pay backs other than those reflected in Finding No. 14 in this Memorandum Opinion have occurred subsequent to April 25, 1989, that money must also be returned to the Debtor by SWB. This Court will entertain further motions for contempt with regard to any of those payments if they exist. Likewise, to the extent no further pay backs were made and there remains $1,702.29 of prepetition commission advances which have not been paid back to SWB through its withholding procedure, such debt has been discharged by the Order of Discharge entered in this case and SWB is permanently enjoined from taking any action whatsoever to collect the same.

■ 2. *Discrimination.* 11 U.S.C. § 525(b) effectively prohibits private employers from discriminating "... with respect to employment against, an individual

who is or has been a debtor under this title....". 11 U.S.C. § 525(b). This provision was added to the Bankruptcy Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353 (1984). Here, the testimony of the Debtor's supervisor clearly indicated that he was not offered participation in the advancement program under the Amendment after he had filed for bankruptcy when all other Account Specialists were offered participation and that the determinative reason for failing to offer it to the Debtor was the fact of his bankruptcy. Clearly, this is discrimination in a manner prohibited by § 525 of the Code.

Since the discrimination did not take any money from the Debtor but only affected the timing of his receipt of his commissions, Debtor's damages are nominal. However, it is the duty of this Court to enforce the important public policy behind 11 U.S.C. § 525 regardless of the extent of the damage, but with due regard to the same. Accordingly, it is the judgment of this Court that SWB is Ordered to pay to the Debtor the sum in the amount of $500.00 by reason of its discrimination in violation of § 525, and to pay to Debtor's counsel the sum of $750.00 as attorneys fees; and SWB is hereby permanently enjoined from engaging in further acts of discrimination with regard to this Debtor by reason of his bankruptcy.

The above Findings of Fact and Conclusions of Law have been made pursuant to Bankruptcy Rule 7052 and a separate Order of even date herewith will be entered pursuant hereto.

## ORDER DENYING IN PART AND GRANTING IN PART MOTION FOR CONTEMPT AND SANCTIONS OF DEFENDANT

Came on for consideration the Motion For Contempt And Sanctions Of Defendant wherein the Debtors (hereinafter referred to as Debtor) complain about certain actions taken by Southwestern Bell Yellow Pages, Inc. in repaying to itself postpetition certain advances which it had made to the Debtor prepetition out of commissions which became payable to Debtor postpetition, and appeared the Debtor in person and by and through his counsel of record, and appeared Southwestern Bell Yellow Pages, Inc., by and through its representatives and counsel of record, and the Court having considered the testimony and evidence adduced at hearing has entered its Memorandum Opinion this same date making Findings of Fact and Conclusions of Law in accordance with Bankruptcy Rule 7052, and based upon the Findings and Conclusions contained in such Memorandum Opinion, it is accordingly,

ORDERED that Southwestern Bell Yellow Pages, Inc., be, and it is hereby, entitled to recoup from the Debtor commissions earned by the Debtor on the Austin South Market Canvass which were otherwise payable at true up of said Market Canvass on November 25, 1988, it is further

ORDERED that Southwestern Bell Yellow Pages, Inc., be, and it is hereby, authorized to retain any money they withheld from the Debtor on November 25, 1988, or thereafter, to the extent such money represented commissions earned by the Debtor for work performed on Market Canvasses other than the Austin South Market Canvass prior to November 15, 1988, pursuant to its right of setoff under the Employment Contract between the parties, it is further

ORDERED that Southwestern Bell Yellow Pages, Inc., be, and it is hereby, ORDERED to pay to the Debtor the amount of money which it withheld from the Debtor on November 25, 1988 and thereafter to the extent such money represented commissions for work performed by the Debtor on Market Canvasses subsequent to November 15, 1988, it is further

ORDERED that the action taken by Southwestern Bell Yellow Pages, Inc. in withholding the sum of $1,746.30 from the Debtors' commission check on April 25, 1989 was in contempt of the stay then in existence; Southwestern Bell Yellow Pages, Inc. is accordingly ordered to pay Fred Walker, the attorney for the Debtors, the sum of $750.00 as attorneys fees, and is further

ORDERED that to the extent Southwestern Bell Yellow Pages, Inc. withheld any further money from the Debtor subsequent to April 25, 1989, it is hereby ordered to pay that money to the Debtors; likewise, to the extent no further withholding was made by Southwestern Bell Yellow Pages, Inc. and there remains $1,702.29 of prepetition commission advances outstanding, such amount are found to be a debt which has been discharged in this case and Southwestern Bell Yellow Pages, Inc., be, and it is hereby, permanently enjoined from taking any action whatsoever to collect the same, it is further

ORDERED that Southwestern Bell Yellow Pages, Inc., be, and it is hereby, Ordered to pay to the Debtor the sum in the amount of $500.00 and to Fred Walker, the Debtor's counsel, $750.00 by reason of its discrimination against the Debtor in violation of 11 U.S.C. § 525, it is further

ORDERED that Southwestern Bell Yellow Pages, Inc., be, and it is hereby, permanently enjoined from engaging in further acts of discrimination with regard to this Debtor by reason of this bankruptcy.