**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Western Bank–Westheimer, Appellant,**

**v.**

**Alan J. GRAHAM, Michael R. Macari, George R. Hinsley, & Fred T. Magee, Appellees.**

**No. B14–92–00872–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 4, 1994.

David Groveman, Houston, for appellant.

Robert V. Holland, Jr., Houston, Kurt M. Sauer, Austin, John H. Boswell, Houston, for appellees.

Before SEARS, LEE and WILLIAM E. JUNELL (Retired), JJ.

## OPINION

WILLIAM E. JUNELL, Justice (Retired).

### I. *Nature of the Case*

This is a breach-of-contract case. Federal Deposit Insurance Corporation ("FDIC") as Receiver for Western Bank–Westheimer ("Bank") sued Alan J. Graham and Michael R. Macari ("Borrowers") as well as George R. Hinsley and Fred T. Magee ("Guarantors") on a note and guarantees. Borrowers/Guarantors counterclaimed to enforce an agreement to reschedule the debt ("Restructure Agreement"). After a bench trial, the trial court held that (1) the terms of the Restructure Agreement supplanted the terms of the note and guarantees, (2) FDIC breached the Restructure Agreement, (3) FDIC was entitled to the amount due under the Restructure Agreement, and (4) Borrowers/Guarantors were entitled to attorneys' fees. Since Borrowers/Guarantors' attorneys' fees exceeded their debt to FDIC, the trial court entered judgment that FDIC take nothing. On appeal, FDIC complains, *inter alia*, that there was insufficient evidence of FDIC's breach and that the award of attorneys' fees to Borrowers/Guarantors was error. We affirm.

### II. *Facts*

We summarize the facts in the light most favorable to the judgment. In 1985, Borrowers formed a joint venture to buy certain real property and construct a shopping center. They financed the project, in part, by a loan from Bank evidenced by a $90,000 note, dated February 11, 1987. The note was secured by the assignment of a fifty percent interest in the joint venture. The debt was guaranteed by Guarantors.

On August 11, 1987, the note matured and Borrowers defaulted.

On October 11, 1987, the Texas Banking Commission declared Bank insolvent. Bank was state-chartered, and FDIC was appointed receiver pursuant to state law.

In August 1988, FDIC, now the owner and holder of the note and guarantees, sued Borrowers/Guarantors to recover principal and interest due. Borrowers/Guarantors counterclaimed for usury.

In November 1988, in lieu of foreclosure, Borrowers deeded the joint venture's real property to a party holding a superior lien to Bank's. Borrowers' debt to Bank was now unsecured.

In May 1989, negotiations with FDIC led Borrowers/Guarantors to propose an agreement whereby FDIC would drop its suit on the note and would reschedule the debt after a significant cash paydown. Under this Restructure Agreement, Borrowers Graham

and Macari and Guarantor Magee would pay FDIC a total of $25,000 to be held by FDIC pending FDIC's approval of the agreement. Guarantor Hinsley was to pay an additional $15,000 when settlement documents were executed. Borrowers/Guarantors would pay the remainder of the debt over a one-year term: a new note would be executed for $73,049.64 at ten percent interest to be paid in eleven monthly installments of $1,500 plus a final balloon payment in month twelve. Hinsley was to give FDIC new collateral, i.e., a second lien on a piece of Houston real estate known as 6200 Kansas Street.

On May 11, 1989, as the initial paydown, FDIC received cashier's checks from Graham, Macari, and Magee totalling $25,000. On May 25, 1989, FDIC approved the Restructure Agreement and applied the $25,000 paydown to the debt. FDIC was responsible to prepare the settlement documents including the new note and second lien.

FDIC began to generate the settlement documents. However, FDIC halted their preparation when it realized that 6200 Kansas Street was owned by 6200 Kansas Street Partnership ("Partnership"), a general partnership comprised of Hinsley and one other partner. Concerned that Hinsley lacked authority to convey a lien on Partnership property to secure a personal debt, FDIC insisted that the lien be executed by both Hinsley and the partner. But Hinsley had become the 100% owner of the Partnership, and FDIC had already accepted a *first* lien against 6200 Kansas Street on Hinsley's lone signature. The first lien secured a $3.85 million Partnership debt unrelated to the Borrowrers' loan.

Hinsley offered a lien on 6200 Kansas Street, but FDIC refused to accept. FDIC asked Hinsley to substitute $78,000 worth of unencumbered collateral. Hinsley declined, and Borrowers/Guarantors made no further payments on the debt.

FDIC resumed prosecution of its original suit on the note and guarantees. In addition to principal, FDIC sought interest at the default rate of eighteen percent. Borrowers/Guarantors amended their counterclaim alleging that (1) the parties had entered into the Restructure Agreement to reschedule the debt, and (2) FDIC's refusal to accept the second lien breached the agreement. FDIC answered that Hinsley's failure to make the $15,000 paydown constituted a prior breach that excused FDIC's performance.

On January 28–29, 1992, there was a trial to the bench, and the trial court held that FDIC breached the Restructure Agreement. The trial court effectively enforced the agreement, finding damages against Graham, Macari, and Magee of $73,049.64 (the debt owed to FDIC under the Restructure Agreement) plus interest. The court also found damages against Hinsley of $88,049.64 plus interest (the additional $15,000 representing the agreed-upon individual Hinsley paydown). But because FDIC breached the agreement, the trial court held FDIC liable for Borrowers/Guarantors' attorneys' fees. In its judgment of April 3, 1992, the trial court offset Borrowers/Guarantors' attorneys' fees against FDIC's recovery on the debt; because the amount of Borrowers/Guarantors' attorneys' fees exceeded the amount of the debt, the trial court entered judgment that FDIC take nothing. FDIC appeals.

## III. *FDIC Breached the Restructure Agreement*

In subpoint A of point of error one, FDIC complains that the trial court erred in failing to hold that Borrowers/Guarantors breached the Restructure Agreement by failing to make a $15,000 payment that was due on approval of the agreement.

We first note that, although FDIC pled a suit on a note and guarantees, the trial was limited to Borrowers/Guarantors' breach-of-contract counterclaim. Responding to Guarantor Magee's motion for summary judgment, the trial court rendered the following partial summary judgment:

On or about May 24, 1989, the Federal Deposit Insurance Corporation entered into a settlement agreement with Fred Magee, Alan Graham, Michael Macari and George Hinsley. This agreement related to a promissory note dated February 11, 1987, between Alan Graham and Michael Macari and Western Bank–Westheimer and a continuing Guarantee Agreement

signed by George Hinsley and Fred T. Magee, Jr.

It is, therefore, **ORDERED** that at the trial of this cause, the aforementioned facts are established without the need of formal proof.

[Emphasis in original.]

In its findings of fact and conclusions of law, the trial court held that:

> [Borrowers/Guarantors] were excused from complying with the terms of the note because: (a) [Borrowers/Guarantors] and [FDIC] agreed that the [Restructure Agreement] would take its place; (b) A different performance was accepted as full satisfaction of performance of the note; and (c) [Borrowers/Guarantors] and [FDIC] agreed that new terms regarding the time for payment, interest rate and collateral would take the place of the note terms regarding time for payment, interest rate and collateral.

At trial, the parties agreed that a bargain was struck but disagreed on the terms.

FDIC argues that the Restructure Agreement required Hinsley to make a $15,000 payment *upon approval* of the agreement by FDIC. It was undisputed that Hinsley never made the payment. Therefore, FDIC maintains, Borrowers/Guarantors materially breached the Restructure Agreement, and FDIC was excused from performing its obligations under the agreement. Borrowers/Guarantors counter that Hinsley's $15,000 payment was due, not *on approval,* but rather, *upon execution of the settlement documents* including the new note and second lien. They contend that FDIC unjustifiably balked at the agreed-upon collateral and never prepared the settlement documents for closing. Therefore, Borrowers/Guarantors insist, FDIC breached the Restructure Agreement first, and Hinsley's obligation to make the $15,000 payment was excused.

We will hold that there was sufficient evidence for the trial court (1) to have declined to find that Hinsley's payment was due on approval of the Restructure Agreement, and (2) to have concluded that Borrowers/Guarantors did not breach the agreement.

FDIC attacks the legal sufficiency of the evidence supporting an adverse finding on which it had the burden of proof. We use a two-part test to address this "matter of law" point of error. First, we examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989). If there is no evidence to support the finding, we then examine the entire record to determine if FDIC's position is established as a matter of law. *Id.* If FDIC established its position conclusively, we will sustain the point of error. *Meyerland Comm. Improvement Ass'n v. Temple,* 700 S.W.2d 263, 267 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

The Restructure Agreement was never reduced to a writing signed by the parties. The basic terms of the agreement were set out in a letter sent to FDIC by Hinsley, who was acting on behalf of himself, Borrowers, and the other Guarantor. The letter, dated May 10, 1989, stated in pertinent part:

> In accordance with our phone conversation on 5–9–89, I am sending this letter to restate my *offer to settle* the note in the name of Alan Graham and Mike Macari and guaranteed by George Hinsley and Fred Magee.
>
> The current *offer:*
>
> (1) apply the $40,000 in cashier's checks to the note.
>
> (2) reduce the interest to 10%.
>
> (3) note would be renewed for one (1) year with payments of $1,500 per month.
>
> (4) second lien on 6200 Kansas to secure the balance of the note.
>
> &ast; &ast; &ast; &ast; &ast; &ast;

[Emphasis added.]

The letter did not specify when the $40,000 payment was due. On May 25, 1989, FDIC personnel notified Hinsley and his agent, Mark Steakley, that FDIC's credit review committee had approved the offer.

Mark Steakley, who represented Hinsley in the FDIC negotiations, testified that it was FDIC's responsibility to prepare a new note and second lien document and that Hinsley's $15,000 payment was due on execu-

tion of the new documents. He stated that the $15,000 was withheld to ensure the settlement documents were properly prepared. Hinsley testified that the $15,000 payment was due when FDIC got back to Borrowers/Guarantors with the necessary paperwork.

We hold that there was some evidence to support the trial court's refusal to find that the Restructure Agreement made Hinsley's $15,000 payment due upon approval of the agreement by FDIC. FDIC's "matter of law" challenge fails the first prong of *Sterner.*

Next, in our factual sufficiency review, we consider and weigh all the evidence and uphold the finding unless the evidence is so weak, or the finding so against the great weight and preponderance of the evidence, to make the finding manifestly erroneous or unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951). We will not substitute our opinion for that of the trier of fact merely because we might have reached a different conclusion. *See id.*

We have summarized the evidence supporting the trial court's refusal to find that Hinsley's $15,000 payment was due on approval. We now survey the contrary evidence. An internal FDIC memorandum, used to present Hinsley's offer to the FDIC's credit review committee, stated: "A $15,000 check which will bring the total funds submitted to $40,000 is to be delivered by Hinsley *upon approval* of this proposal." [Emphasis added.] Another internal FDIC memorandum, dated May 26, 1989, directing FDIC's legal counsel to cease litigation on the note, stated: "The remaining $15,000 is to be received within the next week." Richard Espinoza, FDIC's account officer, testified that Hinsley's $15,000 was due on approval, but that a one-week extension was granted.

The trial court, as trier of fact, could have resolved the conflict in evidence in favor of Borrowers/Guarantors. We hold that the trial court's refusal to find that Hinsley's $15,-000 payment was due on approval of the Restructure Agreement was not against the great weight and preponderance of the evidence.

■ Moreover, even if Hinsley's $15,000 payment was due on approval of the agreement, the trial court could have impliedly found that Hinsley's withholding the payment until closing would not have constituted a *material* breach. There was no evidence of a "time-is-of-the-essence" term regarding the timing of the final downpayment. *Cf. D.E.W., Inc. v. Depco Forms, Inc.,* 827 S.W.2d 379, 382 (Tex.App.—San Antonio 1992, no writ) (when such term is present, performance at the time specified is essential to one's right to require performance of other party). The trial court could have found that the *timing* of the final downpayment did not go to the entire consideration of the Restructure Agreement, so long as the debt owed FDIC was reduced at closing to the agreed-upon amount of the new note. Consequently, FDIC's performance was not dependent upon Hinsley's prompt payment on approval. *Cf. id.* (mutually dependent promises go to the entire consideration of the contract). We note the common practice of a final downpayment at the closing of a house sale.

In sum, we find that there was legally and factually sufficient evidence to support the trial court's conclusion that Borrowers/Guarantors did not breach the Restructure Agreement when Hinsley failed to make the $15,-000 payment on approval of the agreement. We overrule subpoint A of point one.

In subpoint B of point one, FDIC argues that the trial court erred in finding that FDIC breached the Restructure Agreement by refusing to accept a second lien on property of 6200 Kansas Street Partnership. FDIC maintains that (1) Hinsley was not empowered to convey a valid, enforceable second lien as promised, (2) FDIC was justified in rejecting Hinsley's partnership interest as substitute, and (3) the failure of Hinsley to convey the second lien was a material breach of the Restructure Agreement excusing FDIC's performance.

It was undisputed that Hinsley did not convey to FDIC a new security interest in any collateral. It was also undisputed that FDIC refused to restructure the debt and did reurge its suit on the original note. At issue is whether Hinsley was ready, willing and able to convey a second lien on 6200 Kansas Street as contemplated by the Restructure Agreement. If so, FDIC was unjustified in rejecting the collateral and reasserting its suit on the note.

The trial court found that, under the Restructure Agreement, "[t]he [new] note would ... be secured by a second lien on 24.63 acres in Houston known as 6200 Kansas Street which was owned by the 6200 Kansas Street Partnership which was owned 100% by GEORGE HINSLEY." We will hold that there was legally and factually sufficient evidence for the trial court to have found that the collateral Hinsley was prepared to tender was the collateral called for by the Restructure Agreement.

FDIC attacks the legal sufficiency of the evidence supporting a finding on which its opponent had the burden of proof. In reviewing such a "no-evidence" point, we consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex. 1987). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *See id.* "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem Inc.*, 650 S.W.2d 61, 63 (Tex.1983).

It was undisputed that 6200 Kansas Street was nominally owned by the 6200 Kansas Street Partnership and that Hinsley was one of only two partners. Steakley, Hinsley's agent in dealings with FDIC, testified that Hinsley's partner had been unable to meet cash calls from the Partnership and that the partner's equity interest in the Partnership had been reduced to zero. In evidence was the 6200 Kansas Street Partnership agreement providing for such equity reduction. Also in evidence was correspondence from Hinsley to the partner notifying the partner of the cash calls and ultimately informing him that his distributive share of the Partnership had been reduced to zero. Hinsley testified that his partner had no interest in the Kansas Street Partnership as of July 1, 1988. This evidence showed that, in practical effect, Hinsley owned 100% of the Partnership at the time of the Restructure Agreement. In August of 1988, FDIC had accepted a renewal of a first lien on 6200 Kansas Street signed by Hinsley alone on behalf of the Partnership. Steakley and Hinsley both testified that, sometime after May 1989, Hinsley's partner filed for bankruptcy but did not list an interest in the Partnership as an asset or name the Partnership or Hinsley as a creditor.

Steakley averred that Hinsley was ready, willing and able to carry out the Restructure Agreement including pledging Partnership property to secure his individual debt. Steakley testified that he communicated to FDIC that, if FDIC was not satisfied with a second lien on 6200 Kansas Street, Hinsley would pledge his Partnership interest, i.e., 100% of the Partnership. The Partnership, in turn, owned 6200 Kansas Street. Steakley testified that FDIC had access to all documents pertinent to the Partnership by virtue of FDIC's holding a $3.85 million Partnership note and first lien on 6200 Kansas Street. FDIC's account officer, Espinoza, testified that a lien on Partnership property would have been acceptable to FDIC, but that a pledge of Hinsley's Partnership interest would not.

We hold that the evidence was legally sufficient for the trial court to have found that, under the Restructure Agreement, FDIC and Hinsley contemplated a second lien on Partnership property executed by Hinsley as sole partner.

Next, in our factual sufficiency review, we survey all the evidence and ask whether the evidence was so weak or the finding so against the great weight and preponderance of the evidence as to render manifestly unfair or unjust the finding that FDIC and Hinsley contemplated a second lien on Partnership property. *See In re King's Estate, supra.*

Having summarized the evidence favorable to the trial court's finding, we now set out the contrary evidence. First, Steakley, Hinsley's agent, testified that proceedings had not been initiated to formally dissolve the 6200 Kansas Street Partnership until sometime in 1990. At time of trial, the dissolution was still pending. Second, the 6200 Kansas Street Partnership agreement prohibited a partner pledging partnership property for other than a partnership purpose or assigning his Partnership interest without the consent of the other partner. Third, FDIC had accepted Hinsley's sole signature on the Partnership's renewal of the first lien based on the declaration: "WHEREAS, George R. Hinsley, Jr. has represented to FDIC that he has the power and the authority to execute this Agreement on behalf of and bind the [Partnership]." Therefore, the first lien was given in the name of the *Partnership* to secure a *Partnership* debt, not a *personal* debt of Hinsley. Fourth, FDIC's account officer, Espinoza, testified that the FDIC wanted Hinsley to put 6200 Kansas Street in his own name so that he could legally convey a second lien to secure his personal debt. Fifth, Espinoza testified that FDIC was mistaken as to the ownership of 6200 Kansas Street. We take this to mean that, at the time of the Restructure Agreement, FDIC thought that Hinsley, individually, owned the property.

Viewed as a whole, the evidence shows that FDIC bargained for a "second lien." There was evidence that Hinsley was ready, willing and able to tender a "second lien" on 6200 Kansas Street, albeit, under the aegis of the Partnership. The evidence suggests that FDIC had second thoughts about the viability of 6200 Kansas Street Partnership property as collateral for Hinsley's personal debt and that the lien's enforceability status was unclear. Nevertheless, we cannot say that it was manifestly unfair or unjust for the trial court to find that, at the time of the Restructure Agreement, FDIC contemplated taking a second lien on Partnership property despite the risk. The evidence was factually sufficient.

The evidence suggested that FDIC may have been mistaken regarding the nature of Hinsley's collateral. But FDIC did not plead mistake. Also, "a mistake by one party to an agreement, where it is not induced by acts of the other party, will not constitute grounds for relief." *See Southern Nat'l Bank v. Crateo, Inc.,* 458 F.2d 688, 692 (5th Cir.1972). There was evidence that FDIC had access to documents illuminating the nature of the promised collateral, and there was no evidence that Borrowers/Guarantors misrepresented facts or were acting other than in good faith. *See id.* at 692–93.

In sum, we hold that the evidence was sufficient for the trial court to have found that Hinsley was prepared to tender to FDIC what FDIC had bargained for. The trial court did not err in concluding that FDIC's refusal to follow through on the Restructure Agreement was not excused by any deficiency in Hinsley's collateral. We overrule subpoint B of point one.

## IV. *Borrowers/Guarantors' Attorneys' Fees*

In point three, FDIC argues that the trial court erred in holding that FDIC, as receiver for a failed financial institution, could lawfully be held liable for payment of attorneys' fees. In point six, FDIC complains that the trial court erred in holding that Borrowers/Guarantors were entitled to offset their attorneys' fees against their debt to FDIC.

### A. *Interfirst Inapposite*

Relying on *Interfirst Bank—Abilene, N.A. v. FDIC,* 777 F.2d 1092 (5th Cir.1985), FDIC contends that attorneys' fees are not recoverable against FDIC as receiver except where (1) the contract, which is the subject of the lawsuit, specifies that the prevailing party will be awarded attorneys' fees; or (2) there is a collateral fund explicitly set up for the benefit of the claimant out of which the attorneys' fees could be drawn. *Id.* at 1097. The court determined that "when the only basis for attorneys' fees is the Texas catch-all statute awarding them in contract cases, ... we find that enforcement of the federal statute requiring ratable distribution precludes [their recovery.]" *Id.* at 1097 n. 2. The *Interfirst* court also held that the attorneys' fees claim at issue was not a "provable" claim against FDIC as receiver under the test set

out in *First Empire Bank v. FDIC,* 572 F.2d 1361, 1367–69 (9th Cir.1978), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978):

> A claim is provable against the FDIC as receiver if (1) it exists before the bank's insolvency and does not depend on any new contractual obligations arising later; (2) liability on the claim is absolute and certain in amount when suit is filed against the receiver; and (3) the claim is made in a timely manner, well before any distribution of the assets of the receivership....

*Interfirst, supra* at 1094, quoting *First Empire, supra.*

The *Interfirst* court held that the attorneys' fees claim at issue failed prongs one and two of the *First Empire* test.

FDIC argues that the Restructure Agreement was silent on attorneys' fees and that there was no collateral fund, separate from the general assets of Bank, from which Borrowers/Guarantors' attorneys' fees could be paid. Therefore, FDIC insists, attorneys' fees are not recoverable by Borrowers/Guarantors.

We hold that *Interfirst* is inapposite to the facts of this case. In *Interfirst,* a claimant won an offset against a debt owed to a failed bank. The claimant then sought recovery of its attorneys' fees as a cash payout from the bank's remaining assets. Although the court allowed the offset, it was concerned that payment of the claim for attorneys' fees would amount to a preference in violation of the National Bank Act's requirement for pro-rata distribution of bank assets to bank creditors. *Id.* at 1097; *see* 12 U.S.C.A. §§ 91 & 194 (West 1989).

■ But Borrowers/Guarantors have not asserted an independent "claim" against FDIC as receiver and the general assets of Bank. Prior to Bank's insolvency, Borrowers/Guarantors were debtors of Bank, and Bank held a note-receivable asset. Post-insolvency, FDIC entered into the Restructure Agreement and FDIC's "asset" (the debt owed by Borrowers/Guarantors) became defined by that agreement. FDIC's course of action to realize on that "asset" was through performance under the agreement. However, FDIC breached the agreement,

causing Borrowers/Guarantors to incur attorneys' fees (1) in defending against FDIC's suit on the original note and (2) in seeking enforcement of the Restructure Agreement. We find that, after FDIC's breach, FDIC's "asset" existed only to the extent that the debt owed FDIC under the agreement exceeded Borrowers/Guarantors' attorneys' fees in overcoming FDIC's breach. The trial court did not award Borrowers/Guarantors an independently enforceable judgment against FDIC. Rather, because FDIC breached the Restructure Agreement, the trial court allowed Borrowers/Guarantors to equitably offset their attorneys' fees against the amount due FDIC. Unfortunately for FDIC, the debt owed FDIC did not exceed Borrowers/Guarantors' fees and was completely extinguished.

■ In the context of a national bank receivership, "if a setoff is otherwise valid, it is not a preference in violation of the National Bank Act; only the balance of deposit over setoff is considered an asset of the receivership." *Interfirst,* 777 F.2d at 1094, quoting *Interfirst Bank—Abilene, N.A. v. FDIC,* 590 F.Supp. 1196, 1199 (W.D.Tex.1984). Similarly, in the context of Bank's state-bank receivership, only the balance of Borrowers/Guarantors' debt to FDIC over their attorneys' fees is considered an asset of the receivership. As discussed below, Borrowers/Guarantors' offset for attorneys' fees was a valid recoupment. As such, it was not a preference in conflict with the Texas depositor preference statute that governed Bank's state receivership. Act of March 24, 1987, 70th Leg., R.S., ch. 8, § 1, 1987 Tex.Gen. Laws 24, 24–25 [current version at TEX.REV. CIV.STAT.ANN. art. 342–804a (Vernon Supp. 1994)].

In sum, *Interfirst* does not apply here because Borrowers/Guarantors' attorneys' fees offset was not a claim against assets available to the Bank's depositors and creditors. Instead, the offset merely factored into the determination of the existence and value of a Bank asset. This is a subtle but important distinction. Borrowers/Guarantors did not seek to separate FDIC from its assets; rather, FDIC's breach of contract caused a potential asset to be dissipated.

### B. "Recoupment" Not "Setoff"

 FDIC cites cases where offsets were denied. But those cases dealt with attempts by a party to offset a debt to a failed bank with a *separate and independent* obligation of the bank. *See, e.g., FDIC v. Miller*, 671 F.Supp. 1286, 1289 (D.Kan.1987) (failed attempt to offset bank's obligation under letter of credit against debt on note); *FDIC v. Texarkana Nat'l Bank*, 874 F.2d 264, 269 (5th Cir.1989), *cert. denied*, 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990) (failed attempt to offset subordinated capital debentures of insolvent bank against recovery sought by FDIC on behalf of insolvent bank); *Grady Properties Co. v. FDIC*, 927 F.2d 528, 531 (10th Cir.1991) (no mutuality of obligation permitting setoff of accounts receivable against promissory notes).

Unlike the attempted "setoffs" in the above cases, Borrowers/Guarantors' attorneys' fees offset is more aptly characterized as a "recoupment."

> A "set-off" is a demand which the defendant has against the plaintiff, arising out of a transaction extrinsic to the plaintiff's cause of action, whereas a "recoupment" is a reduction or rebate by the defendant of part of the plaintiff's claim because of a right in the defendant arising out of the same transaction.

BLACK'S LAW DICTIONARY 1147 (5th ed. 1979).

> [Recoupment is] [a] right of the defendant to have a deduction from the amount of the plaintiff's damages, for the reason that the plaintiff has not complied with the cross-obligations or independent covenants arising under the same contract. . . . [Recoupment] is applied where a man brings an action for breach of a contract between him and defendant; and where the latter can show that some stipulation in the same contract was made by the plaintiff, which he has violated, the defendant may, if he choose, instead of suing in his turn, *recoupe* his damages arising from the breach committed by the plaintiff. . . . [Recoupment] is a purely defensive matter growing out of transaction constituting plaintiff's cause of action and is available only to

reduce or satisfy plaintiff's claim and permits of no affirmative judgment.

*Id.* at 1146 (emphasis in original).

Borrowers/Guarantors' demand against FDIC for attorneys' fees does not stem from a transaction extrinsic to FDIC's cause of action. Instead, FDIC's liability to Borrowers/Guarantors for attorneys' fees and Borrowers/Guarantors' liability to FDIC on the debt both arise from the same contract, i.e., the Restructure Agreement. Borrowers/Guarantors do not seek an affirmative judgment against FDIC but merely to reduce or satisfy FDIC's claim. "[Recoupment] is a doctrine of an intrinsically defensive nature founded upon an equitable reason, inhering in the same transaction, why plaintiff's claim in equity and good conscience should be reduced." *Pennsylvania R.R. v. Miller*, 124 F.2d 160, 162 (5th Cir.1941), *cert. denied*, 316 U.S. 676, 62 S.Ct. 1047, 86 L.Ed. 1750 (1942). Recoupment may prevent an unjust result where setoff is not available or appropriate. *See In re Fiero Production, Inc.*, 102 B.R. 581, 586 (Bankr.W.D.Tex.1989) (recoupment is exception to rule that no creditor of a bankrupt shall receive preferential treatment). On the facts of this case, we hold that Borrowers/Guarantors were entitled to recoup their attorneys' fees.

### C. Attorneys' Fees Not "Punitive"

 FDIC also contends that the award of attorneys' fees to Borrowers/Guarantors was equivalent to punitive damages, which are not recoverable against FDIC as receiver. *FDIC v. Zoubi*, 792 S.W.2d 825, 829 (Tex. App.—Dallas 1990, no writ). We hold that the award of attorneys' fees in this case was not punitive. The recoupment merely gave Borrowers/Guarantors much of the benefit of their bargain and placed them nearly in the position they would have been, had FDIC performed under the Restructure Agreement.

### D. FDIC's Limitation–of–Liability Statute Inapposite

Finally, FDIC contends that Borrowers/Guarantors' offset violates 12 U.S.C.A. § 1821(i)(2) (West 1989):

The maximum liability of the Corporation, acting as receiver or in any other capacity, to any person having a claim against the receiver or the insured depository institution for which such receiver is appointed shall equal the amount such claimant would have received if the Corporation had liquidated the assets and liabilities of such institution without exercising the Corporation's authority under subsection (n) of this section or section 1823 of this title.

*Id.*

■ Under certain circumstances, FDIC, in its corporate capacity, can assist a failing depository institution by forming bridge banks, making loans or deposits, purchasing assets, assuming liabilities, or otherwise making contributions. *See* 12 U.S.C.A. §§ 1821(n) & 1823(c). We read § 1821(i)(2) to mandate that a claim against the FDIC must be satisfied out of the net assets of the failed bank as though the bank's assets had not been augmented by FDIC. This is simply a limitation-of-liability statute to encourage the infusion of FDIC capital into the financial structure of a failing bank. When the FDIC injects capital into a failed bank, some creditors may benefit more than others. Section 1821(i)(2) prevents a creditor, who did not receive the full benefit of FDIC intervention, from suing FDIC for the difference. *See Branch v. FDIC*, 825 F.Supp. 384, 413–14 (D.Mass.1993).

■ In the present case, we have held that Borrowers/Guarantors' have not asserted a "claim" against Bank assets; rather, they enjoyed an equitable recoupment against a claim asserted against them by FDIC. Moreover, the record does not reflect that Borrowers/Guarantors' recoupment puts at risk any FDIC-infused funds so as to trigger the limitation of liability contemplated by § 1821(i)(2). On the present facts, we find that FDIC's limitation-of-liability statute is no bar to Borrowers/Guarantors' recoupment of their attorneys' fees.

We overrule points three and six.

## V. *Attorneys' Fees Without Damages?*

■ In point four, FDIC maintains that the trial court erred by failing to conclude that, in order to be awarded attorneys' fees under Chapter 38 of the Texas Civil Practices and Remedies Code, Borrowers/Guarantors needed to be the prevailing party and be awarded damages.

The trial court found that (1) Borrowers/Guarantors had sustained *zero* "actual damages," and (2) FDIC was entitled to the balance due under the Restructure Agreement. Therefore, FDIC declares *itself* the prevailing party and complains that there was no justification for an award of attorneys' fees to Borrowers/Guarantors.

Chapter 38 provides for the recovery of attorneys' fees associated with a successful claim on an oral or written contract. Tex. Civ.Prac. & Rem.Code Ann. § 38.001(8) (Vernon 1986). It has been held that Chapter 38 provides a basis for the recovery of attorneys' fees against FDIC as receiver of a failed bank. *FDIC v. F & A Equip. Leasing*, 854 S.W.2d 681, 691 (Tex.App.—Dallas 1993, no writ).

■ However, in order to recover attorneys' fees under Chapter 38 a party must be the "prevailing party" in the case. *Criton Corp. v. The Highlands Ins. Co.*, 809 S.W.2d 355, 357 (Tex.App.—Houston [14th Dist.] 1991, writ denied). A prevailing party is "one of the parties to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not to the extent of its original contention." *Id.*, quoting Black's Law Dictionary (4th ed. rev.).

FDIC argues that it prevailed on the "main issue" in this case, i.e., whether Borrowers/Guarantors were indebted to FDIC under the Restructure Agreement. But FDIC ignores its own pleadings and misconstrues the "main issue." FDIC went to trial on live pleadings that asserted a suit on the original promissory note and guarantee agreements. The pleadings sought eighteen percent default interest. At trial, confronted with Borrowers/Guarantors' breach-of-contract counterclaim and the trial court's partial summary judgment, FDIC consented to litigate the Restructure Agreement (with its ten percent interest). The trial centered on the issue of who breached the Restructure

Agreement, and the trial court found that FDIC breached.

In *Carr v. Austin Forty*, 744 S.W.2d 267 (Tex.App.—Austin 1987, writ denied), plaintiff sought the return of a letter of credit given as earnest money on a business deal that ultimately failed. *Id.* at 269. The defendant had attempted unsuccessfully to draw on the letter, but the letter had since lapsed by its own terms. The trial court held for plaintiff, but denied attorneys' fees because the letter of credit had expired undrawn-upon and plaintiff had not suffered actual damages. The court of appeals reversed the trial court and awarded attorneys' fees to plaintiff, holding that the return of the letter resolved the conflicting legal claims between the parties concerning any indebtedness by plaintiff to defendant evidenced by the letter. *Id.* at 270.

As we see it, the "main issue" in the present case was whether FDIC would prevail and be able to execute on the original note and guarantees or whether Borrowers/Guarantors would prevail and be able to hold FDIC to the Restructure Agreement. In the trial itself, the main issue was who breached the agreement. Borrowers/Guarantors won on both scores. As in *Carr*, the trial court's judgment resolved the contractual controversy regarding Borrowers/Guarantors' indebtedness to FDIC. We conclude that Borrowers/Guarantors were prevailing parties.

Although the trial court did not expressly award Borrowers/Guarantors "actual damages," Borrowers/Guarantors clearly enjoyed an economic benefit from the resolution of the controversy with FDIC. FDIC had sought to collect interest on the original note at the default rate of *eighteen percent* from August 11, 1987, the date of default. In determining the amount due FDIC under the Restructure Agreement, the trial court began with the agreement's principal and interest figure of $73,049.64, which included interest that had accrued since February 11, 1987 at the variable rate of *base plus two percent* (ten to twelve percent range). The trial court then applied the agreement's *ten percent* interest rate from July 1, 1989, the date the new one-year note was to have been

executed. In effect, the disposition of the case resulted in Borrowers/Guarantors enjoying a six to eight percent interest rate advantage over more than a five-year period (August 1987 through April 1993).

We hold that Borrowers/Guarantors were entitled to attorneys' fees because they prevailed on the main issue in the case and secured an economic benefit equivalent to an award of actual damages. We overrule point four.

## VI. *Moot Points*

In point two, FDIC contends that the trial court erred in awarding specific money damages against the various Borrowers/Guarantors, rather than imposing joint and several liability. In view of our disposition of the above points of error, point two is moot.

In point five, FDIC asserts that the trial court erred by holding that the law permits recovery of pre- and post-judgment interest on attorneys' fees. This point of error is also moot. Given our disposition of the preceding points of error, Borrowers/Guarantors' recoupment was extinguished at the time of judgment in neutralizing FDIC's claim. Borrowers/Guarantors had no residual claim upon which to draw post-judgment interest. Also, even if we reversed the finding of $17,405.44 in pre-judgment interest on attorneys' fees, such reversal would be more than offset by Borrowers/Guarantors' entitlement to $20,000 in appellate attorneys' fees. Consequently, Borrowers/Guarantors' recoupment would still exceed the debt to FDIC and completely offset it. Therefore, the issue of pre-judgment interest is moot.

## VII. *Conclusion*

FDIC's points of error are either overruled or moot. Finding no error, we affirm the judgment below.